# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

COURTNEY KIMBLE                                                    CIVIL ACTION

VERSUS

BURL CAIN                                                          NO. 07-0396-FJP-DLD

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court on the petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The petitioner, Courtney Kimble, challenges his conviction and life sentence, entered in 2001 on one count of second degree murder, a violation of La. R.S. 14:30.1. The petitioner contends that the trial court erred in failing to rule on a pending motion to provide funds for an investigator and/or expert and that his attorney provided ineffective assistance at trial by (1) failing to pursue the pending motion for funds, (2) failing to move for a severance of the trial of the two co-defendants, and (3) failing to object to an erroneous and prejudicial jury instruction.

After a joint trial by jury conducted in January, 2001, the petitioner was found guilty of having committed the second degree murder of Carl Jacobs on January 16, 2000, and the co-defendant was convicted of attempted second degree murder.  The two defendants were sentenced on January 24, 2001, with the petitioner being sentenced to life imprisonment and the co-defendant being sentenced to fifty (50) years in confinement.   The petitioner thereafter appealed his conviction, asserting as a single assignment of error that the trial court erred in denying the petitioner's motion for a mistrial based on alleged prosecutorial misconduct during closing arguments.  On September 27, 2002, the petitioner's conviction was affirmed by the Louisiana Court of Appeal for the First Circuit, and on September 5, 2003, the petitioner's application for supervisory review in the Louisiana Supreme Court was denied.  State v. Kimble, 852 So.2d 1023 (La. 2003).

On September 3, 2004, the petitioner filed an application for post-conviction relief in the state district court, asserting (1) that he was provided with ineffective assistance of counsel because his trial counsel was appointed and uncompensated, because she failed to obtain a ruling from the trial court on a motion for funds to hire an investigator and expert, because the record did not reflect that the defendant was present at all times during trial, because the record did not reflect the reason for peremptory releases of certain jurors, and because the jury was not polled on each occasion that trial resumed, and (2) that he was denied a fair trial due to prosecutorial misconduct in allowing a witness to refer to additional evidence of the petitioner's guilt which was never admitted at trial, and in exceeding the scope of proper rebuttal during closing argument.  While this application was initially denied in the district court as untimely, the state appellate court reversed and remanded the matter on December 30, 2004, for substantive consideration of the petitioner's claims.  Several days prior to a subsequent scheduled hearing on the petitioner's application, scheduled for October 19, 2005, the petitioner filed a supplemental brief in support of his application wherein he asserted the additional claims that he was provided with ineffective assistance of counsel because his trial attorney failed to move for a severance of the trial of the two co-defendants and failed to object to an improper and prejudicial jury instruction as to principals. Although neither the trial judge nor the opposing attorney received or had an opportunity to review the newly added claims prior to the hearing, the hearing was conducted as scheduled, and the trial judge substantively addressed and denied the newly added claims.  Applications for supervisory review were thereafter denied by the intermediate appellate court and by the Louisiana Supreme Court, with the latter court denying review on June 1, 2007.  See State v. Kimble, 957 So.2d 172 (La. 2007).

On June 7, 2007, the petitioner filed the instant application for habeas corpus relief in this Court.  The State asserts that a deferential review of the state court proceedings and findings, as

mandated by 28 U.S.C. § 2254(d) and (e), compels the conclusion that the petitioner's claims must be rejected.

Factual Background

The evidence adduced at trial reflects that in the early morning hours of January 16, 2000, Deputies Kenneth Schligelmeyer and Crane Wolf noticed that a bar located on Old Baton Rouge Highway in Tangipahoa Parish was still operating notwithstanding a mandatory 2:00 a.m. closing time.  As they were thereafter taking action to close the bar, they heard two shots coming from an adjacent parking lot.  According to Deputy Schligelmeyer, the shots came in rapid succession, and it sounded as though the shots were fired from the same weapon.[1]  Arriving at the scene within seconds, Deputies Schligelmeyer and Wolf found the body of the victim, Carl Jacobs, lying on the ground, with a fully loaded .45 caliber semi-automatic handgun lying on his chest and with a single gunshot wound to the left side of his head.  A subsequent examination of the handgun revealed that it had not been fired inasmuch as the clip was full and a bullet was still in the chamber.  Statements were then obtained from persons at the scene which implicated the petitioner and co-defendant Daniel Watts as suspects in the shooting.  Upon going to the petitioner's residence later that morning, deputies obtained a consent to search his vehicle and found a camouflage jacket in the back seat with what appeared to be blood spots on it.  A subsequent analysis of the jacket confirmed that the spots were in fact blood, and that the blood was Type A, consistent with the decedent, whereas both the petitioner and the co-defendant have Type B blood.  No DNA tests were undertaken to confirm that the blood on the jacket was that of the decedent.

Approximately two weeks after the incident, on January 30, 2000, co-defendant Daniel Watts was arrested and, after being advised of his rights, provided a recorded statement to

---

[1]    Although Deputy Schligelmeyer testified at trial that the shots came in rapid succession, documentation in the record includes a written report prepared at or near the time of the shooting by Deputy Crane Wolf which reflects that the second shot came "a few seconds after" the first.

investigators, wherein he explicitly implicated the petitioner as the shooter.  Specifically, he stated that prior to the shooting, a dispute had arisen between the petitioner and the decedent, with the decedent grabbing the petitioner around the throat and making threatening gestures with a gun which the decedent carried.  The petitioner and co-defendant then left the bar, but as they were leaving, the decedent came walking up behind them, yelling at them, and when the decedent pulled out a handgun, the petitioner also pulled out a handgun and shot the decedent.  Approximately a month after this initial statement, the co-defendant provided a second, unrecorded, statement wherein he again implicated the petitioner as the shooter, but he asserted for the first time that he himself had also possessed a handgun on the night of the shooting but had not been the shooter because his gun had jammed when he attempted to fire it.

Testimony was adduced from several witnesses who were present on the night of the shooting which implicated the co-defendant, not the petitioner, as the shooter.  For example, Ms. Martha Vanessa Oliver, an apparently disinterested witness, testified that immediately prior to the shooting, she was standing at the door to her vehicle and saw a Mr. Romero Watkins (who was initially identified by law enforcement officers as a suspect in the shooting but was not indicted) hand a black handgun to the co-defendant, whereupon she saw the co-defendant fire the weapon once (she subsequently heard a second shot some moments later, "farther up the road").  When she turned on her vehicle's headlights, she observed the decedent lying on the ground in front of her vehicle.  Consistent with this testimony, Ms. Tiffany Coins testified that she was sitting in the back of Ms. Oliver's vehicle and also observed, through the window, someone holding, pointing, and shooting a black handgun (twice, according to her), but she was unable to identify the person doing so because it was dark.  Finally, Mr. David Roberts testified that he was standing talking with the decedent when the decedent was shot (and he also heard a second shot, "later on").  Although Mr. Roberts could not identify who shot the decedent, he testified that the shooter was wearing camouflage clothing, which was consistently noted to have been worn by the co-defendant on the

4

night of the shooting and not by the petitioner.  Mr. Roberts further testified that the decedent did not have a gun that evening or make any threatening gestures prior to the shooting but was instead drinking from a bottle of whiskey immediately prior to the fatal shot being fired.

There was also testimony at trial which implicated the petitioner as the shooter, but this testimony was subject to substantial question.  First, as noted above, the co-defendant provided two statements which were presented before the jury and which explicitly identified the petitioner as having fired the fatal shot.  Statements by a suspect in custody, however, are "presumptively unreliable", Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), and a suspect's obvious desire to deflect attention away from himself "militates against depending on his veracity." Lilly v. Virginia, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).  Second, Ms. Daytra Miller testified that she left the club walking with the decedent and, after they split up to go in separate directions, she heard a single shot behind her.  When she turned to look, she saw the petitioner coming toward her.  Her sole testimony on direct examination regarding the petitioner, however, was that when he reached her, he said to her, "shush" and "be quiet."  She then provided, on cross-examination, a statement that could be interpreted as indicating that she saw the petitioner holding a smoking gun.  This statement was ambiguous in the extreme, however, because she did not indicate by name the person she saw holding a gun.  Specifically, when asked by the petitioner's attorney whether she had seen a weapon being fired, Ms. Miller stated:

A.    When I looked back the gun was already smoking and had been fired already.

Q.    You didn't see anybody fire that weapon?

A.    No, I didn't.  I just seen him holding it.

Q.    So, based upon what you saw, you have no idea how Carl got shot, isn't that correct?

A.    No, I just saw him with the gun.

5

It was never clarified who the "him" was that Ms. Miller observed with the gun.[2]  The jury, however, may have inferred, because the witness was being questioned about the petitioner coming toward her and telling her to be quiet, that the petitioner was the person she saw holding a gun.  The prosecution, in fact, made this exact argument during its closing statement to the jury.

Finally, Mr. Romero Watkins testified that he observed the initial confrontation between the petitioner and the deceased, during which the deceased choked the petitioner.  According to Mr. Watkins, this confrontation took place earlier in the evening and, after it was broken up, the petitioner, co-defendant Watts and Mr. Watkins left the club, with the petitioner reportedly calling out, this "ain't over yet".  Mr. Watkins then went home, but the petitioner and co-defendant soon visited him, asking Mr. Watkins to assist them in locating bullets to a .44 magnum handgun which the co-defendant had at his house.  The three of them then drove to the co-defendant's house, and Mr. Watkins and the co-defendant searched for the bullets while the petitioner retrieved the .44 magnum from the rear of the house.  According to Mr. Watkins, after they found the bullets, the petitioner placed the handgun in one pocket and the bullets in another, and the three of them then

---

[2]      This ambiguity is also apparent in the police records.  In Ms. Miller's written statement following the photographic lineup, she writes only that the petitioner "is the man that told me to be quiet at the end of my friend Renee car.  He was ducking down at the end of the car." Record, Vol. III, at p. 57.  She says nothing in this statement about seeing the petitioner with a gun. In addition, a sheriff's deputy describes Ms. Miller's verbal statement as being that the witness "identified one Courtney R. Kimble ... as one of the suspects [plural] standing beside Carol [sic] Jacobs when the first shot was fired", and that "she was yelling to the suspect [singular] that she seen him shoot and that Courtney Kimble told her to be quiet at least three (3) times then he (Kimble) waited and then walked away." Record, Vol. III, at p. 64.  The manner in which the deputy differentiates between the unnamed "suspect", at whom the witness was yelling, and the named Courtney Kimble, who was telling her to be quiet, suggests that the witness may not have been referring to the petitioner as the person she saw holding the gun.  Rather, an interpretation is available that she observed the "suspects" (the petitioner and his co-defendant) standing near the decedent, that she yelled at the "suspect" (the co-defendant) after the shooting that she saw him holding a gun, and that the petitioner then told her to be quiet.  This interpretation is consistent with the initial focus by law enforcement on the co-defendant as the shooter, or principal suspect, at the time of the statement, and with the testimony of Vanessa Oliver and David Roberts, at trial, both of whom implicated the co-defendant as the shooter, the former by testifying that she observed the co-defendant fire his weapon and the latter by testifying that the shooter was wearing camouflage clothing, which clothing was apparently worn by the co-defendant on the night of the shooting.

drove to another house, whereupon the co-defendant went in and obtained for himself a black 9 mm semi-automatic handgun.  The petitioner and co-defendant then dropped Mr. Watkins back at his house and returned to the club, with the petitioner reportedly saying during the drive that they were "going to show [the decedent] about putting his hands on a man".  Finally, after a little while, Mr. Watkins returned to the club himself and, as he arrived, observed the decedent exiting the club.  At the same time, he observed the co-defendant approaching the decedent from one direction with the 9 mm semi-automatic in his hand, and observed the petitioner standing by a vehicle placing bullets in the .44 magnum.[3]  As the decedent then reached the petitioner, the petitioner came around the front of the vehicle and shot the decedent in the head.  In addition, according to Mr. Watkins, the co-defendant fired his weapon twice from the rear of the vehicle, missing both times because the decedent had fallen to the ground.  After the shooting, Mr. Watkins and the co-defendant drove together to Baton Rouge where they stayed for 14 days.  During this time, the co-defendant asked Mr. Watkins to "help him out" as much as he could.

Mr. Watkins' testimony was subjected to substantial credibility attack.  Initially, it appears that Mr. Watkins' lied in an initial statement given to deputies and omitted any reference to the co-defendant having possessed or fired a weapon on the night of the shooting.  This was reportedly because the co-defendant had requested Mr. Watkins' "help" and also because Mr. Watkins was afraid of the co-defendant.  It was only during a subsequent recorded statement that Mr. Watkins acknowledged that the co-defendant had had a weapon and had fired it on the night of the shooting.  Further, Mr. Watkins did not testify consistently at trial with either of his prior statements, inasmuch as at trial, Mr. Watkins testified that the co-defendant fired twice from the rear of the vehicle and missed both times, whereas in his recorded statement, Mr. Watkins asserted that, after the

---

[3]     Neither the 9 mm semi-automatic allegedly utilized by the co-defendant nor the .44 magnum allegedly utilized by the petitioner were ever recovered.  The only weapon introduced at trial was the .45 caliber semi-automatic which was found at the scene of the shooting, fully loaded and un-discharged, lying upon the chest of the deceased in the parking lot where he was killed.

decedent fell to the ground, the co-defendant stood over the decedent and shot him twice more. Finally, Mr. Watkins acknowledged that he was a twice-convicted felon with a substantial criminal record and faced mandatory life imprisonment if convicted for a third time.   He further acknowledged that he had been on parole release from a prior conviction on the night of the shooting and that he was aware that, as a felon on parole, he was prohibited from possessing either a firearm or ammunition and could face a third felony sentence if convicted of such possession. Although he denied making any deal with law enforcement officials in connection with his testimony in this case, he acknowledged that he had initially been a suspect in the shooting, that he had previously acted as a police informant on multiple occasions, and that he had previously made deals on multiple occasions to provide information to law enforcement officials in order to avoid criminal prosecution.  In short, there was substantial reason to question the veracity of Mr. Watkins' testimony.[4]

Investigating officials never located either of the handguns allegedly carried by the petitioner and co-defendant on the night of the shooting, nor were any shell casings found at the scene of the homicide.  Nor was any testimony elicited regarding the likely caliber of the bullet which killed the decedent.

<u>Legal Analysis</u>

Turning to a substantive review of the petitioner's claims, the standard for review in this Court is that set forth in 28 U.S.C. § 2254.  Specifically relevant is 28 U.S.C. § 2254(d)(1), which provides that an application for a writ of habeas corpus shall not be granted with respect to any claim that a state court has adjudicated on the merits unless the adjudication has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision

---

[4]        The Court further notes that witness David Roberts testified that Romero Watkins was inside the club at the time of the shooting and so could not have seen what he testified to.

that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See also Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).  Relief is authorized if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  Relief is also available if the state court identifies the correct legal principle but unreasonably applies that principle to the facts of the prisoner's case or reaches a decision based on an unreasonable factual determination.  See 28 U.S.C. § 2254(d)(1)-(2); Montoya v. Johnson, 226 F.3d 399 (5th Cir. 2000), cert. denied, 532 U.S. 1067, 121 S.Ct. 2220, 150 L.Ed.2d 212 (2001).  Mere disagreement with the state court is not enough: The standard is one of objective reasonableness.  Montoya, supra, 226 F.3d at 404.  See also Williams v. Taylor, supra, 529 U.S. at 409, 120 S.Ct. at 1521 (2000)("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable").  State court determinations of underlying factual issues are presumed correct, and the petitioner has the burden to rebut the presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The State contends that, applying this standard to the petitioner's claims, there is no basis for the granting of habeas relief.

Initially, to the extent that the petitioner complains that the trial court erred in failing to rule on pending motions for funds to retain an expert and/or investigator, this claim is not one of constitutional dimension.  Under Louisiana law, motions pending at commencement of trial are deemed waived when the defendant proceeds to trial without raising as an issue the fact that the motions have not been ruled upon.  State v. Gaddis, 839 So.2d 1258 (La. App. 2d Cir. 2003), writ denied, 872 So.2d 519 (La. 2004), cert. denied, 544 U.S. 926, 125 S.Ct. 1649, 161 L.Ed.2d 487 (2005); State v. Jackson, 746 So.2d 698 (La. App. 5th Cir. 1999).  In addition, as stated by the trial

judge at the post-conviction relief hearing in state court, his usual practice is to ask attorneys on the scheduled hearing date whether there are any outstanding motions, and if the attorneys respond in the negative, he advises them that, "to the extent there are any other motions that are not being addressed today ... then those motions are deemed to have been dismissed [or] abandoned."  Although the trial judge had no specific recollection of having done so in this case, he stated his belief that he had addressed the parties in this fashion.  Based upon the foregoing, this Court sees no constitutional error in the failure of the state trial judge to address pending motions which the parties did not wish to pursue.

Turning to the petitioner's remaining claims, he asserts that he was provided with ineffective assistance of counsel in several respects.  In this regard, a habeas petitioner who claims ineffective assistance of counsel must affirmatively demonstrate:

(1)     That his counsel's performance was "deficient", <u>i.e.,</u> that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and

(2)     That the deficient performance prejudiced his defense, <u>i.e.,</u> that counsel"s errors were so serious as to deprive the defendant of a fair trial, a trial in which the result is reliable.

<u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  The petitioner must make both showings in order to obtain habeas relief based upon an alleged ineffective assistance of counsel.  <u>Id.</u>     To satisfy the deficiency prong of the <u>Strickland</u> standard, the petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards.  <u>See</u>, <u>e.g.</u>, <u>Martin v. McCotter</u>, 796 F.2d 813 (5th Cir. 1986), <u>cert. denied</u>, 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 985 (1987). The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence and that, under the circumstances, the challenged action might be considered sound trial strategy.  <u>See</u>, <u>e.g.</u>, <u>Bridge v. Lynaugh</u>, 838 F.2d 770 (5th Cir. 1988).  This Court, therefore, must make every effort to eliminate the distorting effects of hindsight

10

and to evaluate the conduct from counsel's perspective at the time of trial.  Martin, supra, 796 F.2d at 817.  Great deference is given to counsel's exercise of his professional judgment.  Bridge, supra, 838 F.2d at 773; Martin, supra, 796 F.2d at 816.

If the petitioner satisfies the first prong of the Strickland test, his petition nonetheless must affirmatively demonstrate prejudice from the alleged errors.  Earvin v. Lynaugh, 860 F.2d 623 (5th Cir. 1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 861 (1989).  To satisfy the prejudice prong of the Strickland test, it is not sufficient for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding.  Strickland, supra, 466 U.S. at 693, 104 S.Ct. at 2067.  Rather, the petitioner must show a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.  Martin, supra, 796 F.2d at 816.  The habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case, he must instead show a probability that the errors are "sufficient to undermine confidence in the outcome."  Id. at 816-17.

Initially, to the extent that the petitioner's application may be interpreted as asserting that his counsel was deficient for failing to pursue the pending motions for funds to retain an investigator and/or expert, this claim is clearly without merit.  First, as to the request for expert assistance, in White v. Maggio, 556 F.2d 1352 (5th Cir. 1977), the Fifth Circuit held that "[f]undamental fairness is violated when a criminal defendant ... is denied the opportunity to have an expert of his choosing ... examine a piece of critical evidence whose nature is subject to varying expert opinion."  The petitioner in the instant case, however, has failed to point out any "critical evidence" – defined as evidence of such substantial probative force that it "could induce a reasonable doubt in the minds of enough jurors to avoid a conviction", White, supra -- that an expert needed to examine in this case.  No firearm or ammunition allegedly utilized by either of the defendants was ever recovered, and no shell casings were found at the scene of the shooting.  Most of the tangible objects introduced at trial were objects recovered from the body of the decedent and did not connect the

11

defendants to the crime.  The principal tangible object which was recovered from the petitioner's car, the blood-spattered camouflage jacket apparently worn by the co-defendant, did not link the petitioner to the crime because he was not alleged to have been wearing this item of clothing on the night of the shooting, no DNA testing was conducted of the blood on the jacket, and even the State conceded that the blood was not that of either the petitioner or co-defendant and, at most, was merely consistent with that of the decedent.  In short, there was no "critical evidence" utilized by the State in this case, "subject to varying expert opinion", which warranted the retention of an independent expert, and there was therefore no deficiency in petitioner's counsel's failure to pursue funds for this purpose.  See Gray v. Rowley, 604 F.2d 382 (5th Cir. 1979), cert. denied, 445 U.S. 944, 100 S.Ct. 1340, 63 L.Ed.2d 777 (1980)(no error in denial of independent expert where seminal fluid on clothing was not tested and so did not link the petitioner to the clothing).

With regard to the request for funds to retain an investigator, the petitioner offers nothing to this Court to suggest what, if anything, an investigator would have discovered or in what manner the petitioner was prejudiced by not having an investigator.  All that the petitioner states in his application to this Court, in total, is that "the record does not reflect that the trial court ever acted on the motion[s]."  In Mason v. Arizona, 504 F.2d 1345 (9th Cir. 1974), cert. denied, 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975),  the Court noted that, upon a reasonable showing by a criminal defendant before trial of the general need for an investigator, including the lines of inquiry the investigator would be asked to pursue and the reason why it would not be practicable for counsel to undertake such investigation, a motion for funds to retain an investigator should normally be viewed with liberality, notwithstanding that it may be difficult in advance of trial for counsel to show an undoubted need for such funds.  However, upon review after trial, as here, the analysis is a different one because the petitioner is in a much better position to demonstrate, if he can, that there has been a denial of due process.  "The question then becomes whether the denial or restriction of investigative funds has substantially prejudiced the defendant at the state court trial."

12

Id.  In the instant case, there has been no attempt made by the petitioner to show what an investigator would have discovered or to show that he was prejudiced by the absence of an investigator or by his attorney's failure to pursue the pending motions for funds.  Accordingly, the petitioner has not carried his burden of showing that his attorney was ineffective in this regard.  See Hoback v. Alabama, 607 F.2d 680 (5th Cir. 1979)("appellant in this case has not made a showing that even closely approaches a denial of effective assistance of counsel or a fundamentally fair trial"), citing Mason v. Arizona, supra.  See also Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)("Given that petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision [to deny motions for investigative assistance].").

The petitioner next contends that his attorney provided ineffective assistance by failing to move for a severance of the trial of him and his co-defendant.  This assertion appears to have merit.  In Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the United States Supreme Court held that a defendant is deprived of his Sixth Amendment right of confrontation when a facially incriminating confession of a non-testifying co-defendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the co-defendant.  Further, in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Court held that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  Statements given to police officers during interrogation after arrest clearly qualify as "testimonial", id. , and moreover, are "presumptively unreliable", Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986).  In the instant case, therefore, the existence of the out-of-court statements made by the non-testifying co-defendant Daniel Watts clearly presented a Bruton situation inasmuch as these statements were facially incriminatory of the petitioner and explicitly identified him as the person who shot the

13

decedent.  Where a <u>Bruton</u> situation exists, the court may protect the Sixth Amendment rights of a non-confessing co-defendant by (1) severance of the trials, (2) exclusion of the incriminating statements, or (3) redaction of the statements to avoid mention or obvious implication of the other defendant.  See <u>Richardson v. Marsh</u>, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).  Here, no motion to sever was filed, no objection to the introduction of these statements was made by the petitioner's attorney, and no request for redaction of the co-defendant's statements was made. Under <u>Bruton</u> and <u>Crawford</u>, therefore, the petitioner has shown a violation of his right of confrontation, which violation could have been avoided had his counsel moved to sever the trials of the petitioner and co-defendant.[5]  See <u>Cruz v. New York</u>, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d (1987) (conviction reversed where confession of non-testifying co-defendant, which implicated the defendant, was admitted in evidence at defendant's trial); <u>Lee v. Illinois</u>, 476 U.S. 530, 106 S.Ct. 2056 (1986) (same); <u>Douglas v. Alabama</u>, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 434 (1965) (conviction reversed where confession of a non-defendant accomplice was read to the jury and where accomplice did not testify but instead invoked his Fifth Amendment right).  Clearly, therefore, it was deficient performance on the part of the petitioner's trial counsel to fail to recognize this Confrontation Clause problem, and it was error on counsel's part to fail to take action to address it.  See <u>Williams v. Washington</u>, 59 F.3d 673 (7th Cir. 1995)(habeas relief granted where

---

[5]     While the State might argue that the petitioner's counsel had three distinct options in dealing with the <u>Bruton</u> situation (severance of the trials, moving to exclude the co-defendant's statements, and redaction thereof to eliminate reference to the petitioner) and that by only arguing the first in the trial court and here, he has procedurally defaulted the two remaining, either of which may have avoided the constitutional error at trial, the State has not made this argument and the Court finds it too facile to accept.   Had the petitioner's counsel moved to sever in reliance upon <u>Bruton</u>, the Confrontation Clause problem would have been clearly and directly placed before both the trial judge and opposing counsel, and upon denial of the motion to sever, the alternatives of exclusion and redaction would necessarily have been considered and addressed.  Upon a finding by this Court that the attorney's failure to consider or file a motion to sever was deficient performance, which deficiency resulted in likely prejudice to the petitioner, <u>see infra</u>, the Court will not find that the petitioner's failure to also raise, in the state courts on collateral review or in this court, the two alternative means of addressing this problem (exclusion and redaction) amounts to a procedural default which inures to the benefit of the State.

"counsel's failure to consider seeking a severance ... was not objectively reasonable" in light of Bruton).[6]

With regard to whether the petitioner suffered prejudice as a result of his attorney's failure to move to sever the trials, with its concomitant Confrontation Clause violation, a constitutional error is cause for federal habeas relief only if it has a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). In analyzing whether a Confrontation Clause error is harmless, the reviewing court should consider, "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, ... and, of course, the overall strength of the prosecution's case. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). When the record is so evenly balanced that there is grave doubt as to whether the error had a substantial and injurious effect or influence in determining the jury's verdict, the error is not harmless. O'Neal v. McAninch, 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

In the instant case, the evidence implicating the petitioner as the shooter, as above-related, was equivocal and suspect in the absence of the incriminating statements of the co-defendant. No

---

[6]     In addressing this issue at the hearing on post-conviction relief, the state trial judge failed to identify the operative legal principal. Specifically, whereas the petitioner's memorandum set forth the issue as involving a violation of the petitioner's "Sixth Amendment right to confrontation," and cited State v. Jenkins, 340 So.2d 157 (La. 1976), which case addressed Bruton in depth, the trial judge instead considered the question of the petitioner's attorney's failure to file a motion to sever as having been related to the two defendants having a potential conflict of interest and needing appointment of separate counsel for that reason. Specifically, the Court stated, "I believe that to some extent that issue was addressed by the Court, and that is why there were two separate attorneys appointed, I believe. I might be wrong, but I think there was a conflict with the Public Defender's Office, and ... I don't remember how, but in any event, there were two separate attorneys, one for each defendant in this case. To that extent, I don't think that there was any conflict, either in representation nor any ineffective assistance of counsel for failure to file a motion to sever." This misidentification of the petitioner's argument may perhaps be attributed to the last-minute filing of the petitioner's memorandum addressing this issue, and by the resulting inability of the trial judge to research the issue and/or review the trial record.

physical evidence was introduced which linked the petitioner to the crime.  Although Ms. Daytra Miller testified that she saw the petitioner coming toward her after the shooting saying "shush" and "be quiet", her testimony about seeing a smoking gun was ambiguous at best and did not in fact implicate the petitioner because she did not explicitly state who she saw holding the weapon.  In addition, although Mr. Romero Watkins testified that the petitioner was the shooter, his testimony was called into substantial question on multiple fronts, notably because he lied to police in an initial statement, because he was admittedly afraid of the co-defendant and was trying to "help him out," because he was a twice-convicted felon who was initially suspected as a participant in the shooting, because he was implicated by one witness as having handed a weapon to the co-defendant immediately before the co-defendant fired the weapon, because he was not even present according to another witness, and because he was a police informant who had admittedly made deals on multiple prior occasions in order to avoid criminal prosecution (although he assertedly did not do so in this case notwithstanding that he admitted on the witness stand to engaging in criminal conduct – both possession of ammunition by a felon and assisting the defendants with arming themselves for the shooting – which potentially subjected him to life imprisonment).

In contrast, there was significant evidence which identified the co-defendant as the perpetrator of the crime, including testimony by Ms.  Martha Vanessa Oliver, an apparently disinterested witness, that she observed the co-defendant fire a weapon after being handed same by Romero Watkins, testimony by David Roberts that the shooter was wearing camouflage clothing, which is consistent only with the description of the co-defendant on the night of the shooting, and even testimony elicited from Romero Watkins that he had previously reported to police that the co-defendant shot the decedent twice.  Finally, it appears from the police investigative file materials in the record that they initially believed the co-defendant, and not the petitioner, to be the shooter based upon statements obtained from witnesses, and that they initially arrested the co-defendant on a charge of second degree murder whereas they arrested the petitioner only on a charge of

16

being a principal to second degree murder committed by the co-defendant.  Even at trial, the prosecution elicited testimony from Sgt. Mark Camelo – in response to a suggestion that the prosecution's case rested principally upon the self-serving statements of the co-defendant and Romero Watkins – that whereas there was additional evidence, independent of these statements, to indicate that the co-defendant possessed and fired a handgun on the night of the shooting, there was, in contrast, additional independent evidence only to indicate that the petitioner was present at the scene on the night of the shooting.  Tr. at 76.  Further, in implicit recognition of the weakness in the State's case, i.e. in apparent recognition of the lack of tangible evidence and of the contradictory evidence pointing to both the petitioner and co-defendant as the shooter, the prosecution offered a plea agreement to each defendant during trial of only fifteen (15) years in confinement instead of the life sentence which they both potentially faced if convicted.  In short, in the absence of the co-defendant's statements, the State's case against the petitioner was relatively weak, and these statements amounted to a critical link in the prosecution and conviction of the petitioner.

Based on the foregoing, and viewing the totality of the evidence, this Court cannot reject the strong possibility that the joint trial of the petitioner and co-defendant, which included the admission of the co-defendant's statements at trial, had a substantial and injurious effect or influence in determining the jury's verdict.  Nor is it possible to conclude that petitioner's counsel's failure to request a severance, in the absence of a request for redaction of the statements or a contemporaneous objection to their admission, was a reasonable exercise of professional judgment or a sound trial strategy.  In light of the extensive Supreme Court and lower court jurisprudence addressing this issue, no competent attorney could have failed to recognize the Confrontation Clause concerns implicit in the unchallenged introduction of the out-of-court statements of the non-

testifying co-defendant at the joint trial.[7]  The United States Supreme Court has recognized that confessions which explicitly implicate a co-defendant are "devastating" and "powerfully incriminating", while at the same time, "their credibility is inevitably suspect".  Bruton v. United States, supra.  See also Richardson v. Marsh, supra.  Based on the facts of this case and the equivocal evidence identifying the petitioner as the shooter, this Court is unable to find that the constitutional violation was harmless.  Accordingly, the Court recommends granting the petitioner's application for habeas corpus on this issue.  See Williams v. Washington, supra (habeas relief granted where "counsel's failure to consider seeking a severance ... was not objectively reasonable" in light of Bruton).

Finally, in the interest of completeness, the Court will address the petitioner's last assertion, i.e., that his attorney provided ineffective assistance by failing to object to the trial court's jury instruction as to principals.  The petitioner argues that this jury instruction relieved the State of its burden of proof as to the petitioner's specific intent to kill or commit great bodily harm.

The Due Process Clause protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).  The mere fact of an erroneous instruction to the jury, however, relative to the elements of the crime charged under state law, is not a basis for federal habeas relief.  Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).  Instead, the Court must focus on "whether the ailing instruction by itself so infected the entire trial process that the resulting conviction violates due process."  Id.  In examining the challenged instruction, the Court does not look at it in "artificial isolation", but must consider it in the "context of the instructions as a whole and the trial record."  Id.  Finally, when there is a question as to whether a jury instruction is ambiguous and violates due process by relieving the

---

[7]     The petitioner's brief before this Court suggests that the petitioner's attorney was relatively inexperienced at handling criminal defense matters.

State of the burden of proof of an element of a crime, the question before the Court is "whether

there is a reasonable likelihood that the jury has applied the challenged instruction in a way that

violates the Constitution." Id.  Accord, Flowers v. Blackburn, 779 F.2d 1115 (5th Cir.), cert. denied,

475 U.S. 1132, 106 S.Ct. 1661, 90 L.Ed.2d 204 (1986).   The applicable test is whether the

instruction "had a substantial and injurious effect or influence in determining the jury's verdict."

Brecht v. Abrahamson, supra.

     In relevant part, the trial court charged the jury as follows:

> Criminal intent may be specific or general.  Specific criminal intent is that state of mind which exists when the circumstances indicate that the defendant actively desired the prescribed criminal consequences to follow his act or failure to act.
> General criminal intent is present when the circumstances indicate that the defendant must have averted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.
> General criminal intent is always present when there is specific intent.  Whether criminal intent is present must be determined in light of ordinary experience.  Intent is a question of fact which may be inferred from the circumstances.
>         *     *     *     *
> Both defendants, Daniel Watts and Courtney Kimble are charged with the second degree murder of Carl Jacobs.  You must make a decision on each defendant separately.  Your verdict as to one defendant should not control your verdict as to the other.
> All persons concerned in the commission of a crime are principals and are guilty of the crime charged if, whether present or absent, they directly commit the act constituting the crime, aid and abet in its commission or directly or indirectly counsel or procure another to commit the crime.
> Second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm....
>         *     *     *     *
> In order to convict the defendant, Courtney Kimble, of second degree murder, you must find that the defendant Courtney Kimble killed Carl Jacobs and that he acted with a specific intent to kill or inflict great bodily harm and that the killing was not in self-defense.

Trial Transcript at p. 143-45.

     The petitioner contends that, rather than requiring a finding that he had the specific intent

to commit second degree murder, the jury instruction as to principals suggested that, without any

reference to intent, he was in fact guilty if he was merely "concerned" in the commission of the

offense, aided or abetted in its commission, or counseled or procured another to commit the

19

offense.  This Court does not agree.  The instruction, read as a whole, clearly requires the jury to find specific intent in order to convict the petitioner of second degree murder.  This is not a case such as <u>Flowers v. Blackburn</u>, <u>supra</u>, <u>or State v. West</u>, 568 So.2d 1019 (La. 1990), where reversal of the convictions was warranted when the jury was not instructed as to the need to find specific intent on the part of each defendant but was instead instructed that, as to principals, a defendant's mere presence at the scene of the crime, while knowing the specific intent of another offender to commit the crime, was sufficient for a finding of guilt and made the defendant an "equal offender".  <u>See also</u> <u>Robertson v. Cain</u>, 324 F.3d 297 (5th Cir. 2003).  Further, even were the Court to find that the jury instruction in this case was vague and/or ambiguous, it is clear that, notwithstanding, the instruction did not have a "substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht v. Abrahamson</u>, <u>supra</u>.  Considering that the jury found the petitioner Kimble guilty of second degree murder and his co-defendant guilty of only attempted second degree murder, there can be no question but that the jury concluded that the petitioner, not the co-defendant, was the person who fired the fatal shot.  Accordingly, the jury did not reach the question whether the petitioner was a principal merely because of his knowledge of the co-defendant's intent.  As a result, the petitioner was not adversely affected by any ambiguity in the instruction as to principals.  <u>See</u> <u>Shilling v. Cain</u>, 82 F.3d 414 (5th Cir. 1996)("In view of the trial record and in light of the fact that the jury found [the petitioner] guilty of first degree murder and his codefendant ... guilty of second degree murder, it is unreasonable to believe that the jury convicted [the petitioner] on the basis of [the codefendant's] intent and not his own.").

　　　　Based upon the foregoing, this Court concludes that the petitioner's application for habeas corpus relief in this Court should be granted because of the violation of the petitioner's Sixth Amendment right to confront the witnesses against him, and that the State should be required to re-try the petitioner within 90 days or release him from confinement.

**<u>RECOMMENDATION</u>**

It is recommended that the petitioner's application for habeas corpus relief be GRANTED because of the violation of the petitioner's Sixth Amendment right to confront the witnesses against him, and that the State be required to re-try the petitioner within 90 days or release him from confinement.

Signed in Baton Rouge, Louisiana, on June 25, 2010.

 

 

**MAGISTRATE JUDGE DOCIA L. DALBY**

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**COURTNEY KIMBLE**                                                    **CIVIL ACTION**

**VERSUS**

**BURL CAIN**                                                          **NO. 07-0396-FJP-DLD**

## <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law and recommendations therein.  Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on June 25, 2010.

**MAGISTRATE JUDGE DOCIA L. DALBY**